McBRIDE, Judge.
Charlie Young, a colored man about forty-eight years of age, met with an accident and was injured while in the-employ of the United Fruit Company as a freight handler on May 4, 1949. Claiming" that his injuries rendered him totally and permanently disabled to do work of a. similar nature, he brings this suit against his employer seeking to recover compensation at the maximum rate for 400 weeks,, plus $500 medical expenses, less compensation paid him for a period of about six weeks.
The answer denied the accident “for lack of sufficient information to justify a belief.” Defendant admitted, however, that it furnished medical treatment to> Young and paid to him compensation in the amount of $317.16 up to July 17,. 1949, the date upon which defendant’s, doctor medically discharged Young as fit to- return to work. Further liability for compensation is denied.
After the matter was submitted, the-trial judge concluded that because of the irreconcilable conflict in the testimony of the medical experts produced by the parties,, the case should be resolved on the testimony of the lay witnesses, and plaintiff' recovered judgment based thereon.
Defendant then timely filed an application for a new trial, upon the grounds (1) that the judgment was contrary to the law- and the evidence, and (2) because since- *221 the trial defendant had discovered new evidence important to the cause, which it could not, with due diligence, have obtained before. Ultimately, the judge granted a “rehearing” and refixed the matter for trial on May 8, 1950. When the case was called on that date, the defendant produced several new witnesses. The trial judge, after considering the nature of the additional testimony, rendered judgment in favor of defendant dismissing plaintiff’s suit, from which the plaintiff has prosecuted this present appeal.
Counsel for plaintiff contends before us that the additional evidence submitted on May 8, 1950, should be ignored, for the reason that the granting of a rehearing meant only that the case should have been reargued and resubmitted for adjudication without further evidence.
Prior to 1926, rehearings in a trial court were unknown in our system of procedure. Definitive judgments could be revised, set aside, or reversed by a new trial, by appeal, by action of nullity, and by rescission. C.P. art. 556. However, Act 10 of 1926 now LSA-RS 13:4262-4263 brought forth an innovation in our peculiar system of procedure. According to the act, a rehearing could be granted in a court of original jurisdiction, and it has been said that the words “new trial” and “rehearing” are not at all synonymous. Indeed, in Jacobs v. Lagrange, 9 La.App. 409, 119 So. 538, the court said that there is no reason why the manner of proceeding on an application for rehearing should be different in a trial court from that in an appellate court. See also Metairie Bank in Liquidation v. Lecler, 4 So.2d 573, decided by us.
But the record reflects that although the trial judge granted what he termed a rehearing, it was his intention to hear such new evidence as either party might see fit to bring forth, or in other words that there should be a new trial. This is demonstrated unmistakably by the opening statement made by the judge when the matter was called on May 8, 1950, that “This is a rehearing for the purpose of letting additional testimony be introduced.” Counsel undoubtedly clearly understood that when the rehearing was granted the right was reserved to either party to Introduce such evidence as they deemed necessary to their interests, and that to all intents and purposes the matter was to be retried.
Moreover, if this be not true, we do not think that the appellant’s position is tenable in light of the circumstances reflected by the record. His counsel made no objection to the introduction of the new evidence, and we think that it is now too late for him to urge a matter of this character on appeal, as he must be deemed to have waived his objection by not having advanced it in the court below.
It is also argued on behalf of appellant that the lower court erred in reopening the case, that contention being based upon the provisions of § 20 of Act 20 of 1914, as amended, now LSA-RS 23:1331, which in part reads: “At any time six months after the rendition of a judgment of compensation, a judge of the trial court that rendered the judgment shall review the same upon the application of either party for a modification thereof, on the grounds that the incapacity of the employee has been subsequently diminished or increased, or that the judgment was obtained through error, fraud, or misrepresentation. * *”
Counsel contends that even if the judgment for compensation which plaintiff recovered on the original hearing was obtained through error, fraud, or misrepresentation, the defendant had no other remedy except to await the period of six months provided for in the above act, before seeking a review of the judgment.
The contention is not valid. It was within the sound discretion of the trial judge to' grant or refuse a rehearing or new trial, and the fact that a rehearing was granted for the purpose of adducing further evidence leaves the plaintiff no room for complaint. The procedure set forth in the act for the modification of a compensation judgment was clearly not intended to have any applicability in a matter where an application for a new trial *222 or rehearing was timely filed. A defendant in a compensation suit is relegated to the procedure outlined in the act only in those instances where the judgment of compensation is effective and executory. In remanding the case of McClung v. Delta Shipbuilding Co., La.App., 33 So.2d 438, 442, for the taking of additional evidence, we said: “* * * If this were not so, a debtor in a compensation judgment would be in a very unfortunate position — his hands would be tied, and he could do nothing but allow the judgment to become ex-ecutory, then await the passage of the six months’ period, meanwhile paying the workman compensation, even though the lower court might have erroneously refused to receive competent evidence, etc., or the judgment might have been obtained through perjured testimony or other ill practices. * * * ”
In Strahan v. Kansas City, Bridge Co., La.App., 191 So. 742, it was held that under the act authorizing a district court to grant a rehearing in civil cases, the judge had authority to grant a new trial and to revise his judgment awarding compensation.
It is not disputed that Young, about 9:30 on the morning of the day of the accident, was carrying on his head a sack of coffee weighing about ISO pounds. He slipped, fell to his knees, and injured his back. The matter was reported to the foreman on the job, and on the same day Young was taken in charge by a Dr. Keen, representing the defendant. It seems that Dr. Keen (who incidentally was not produced as a witness) treated plaintiff until about July 17, 1949, when he was discharged by the doctor as being able to return to the duties of his employment.
Notwithstanding the medical discharge, Young insists that the injuries and resulting constant pain still manifest themselves to such an extent that he cannot return to his former occupation, or do any manual labor whatsoever.
We find in the record the testimony of five physicians. Doctors E. H. Maurer, Irving Redler, and Irvin Cahen appeared for the plaintiff; the defendant produced and relies upon the testimony of Doctors H. Theodore Simon and Guy A. Caldwell. It appears that none of the medical experts rendered treatment to Young, and their testimony is confined to their findings on physical examinations of plaintiff made by them.
Dr. Maurer made his examination on August 1, 1949. His conclusion was that Young was suffering from an acute lum-bosacral strain and degenerative hyper-trophic arthritis of the lumbar spine, which had been aggravated by trauma. He stated his opinion to be that Young was incapacitated to do any heavy work. Dr. Redler, who observed plaintiff on November 11, 1949, concluded that there was a chronic injury of the lumbosacral joint, which he thought would prevent plaintiff from performing manual labor. There was present spasm of the spinal muscles, which may have resulted from other causes. His X-rays showed an arthrosis, but he could not say whether the condition existed before the injury; he stated that accidents such as was described to him by Young generally aggravate pre-existing arthrosis. Dr. Cahen, on August 15, 1949, found a curvature of the spine accompanied with arthritic changes. He believed that there was a strain of the ligaments of the joint between the vertebral column and the pelvis, the presence of which, in a man of Young’s age, would preclude recovery except after a prolonged period. His conclusion was that the plaintiff was incapacitated.
On the other hand, Dr. Simon, who made his tests on June 24 and 27, 1949, found nothing but slight excessive lordosis, which could not have resulted from the accident. The X-rays ordered by him showed marked hypertrophic osteo-arthritis of the lower lumbar vertebrae. Dr. Simon saw no reason why Young could not return to his former occupation, and believed that his discomfort was not genuine, as there were no findings to substantiate the continued discomfort claimed by plaintiff.
Dr. Caldwell made what he termed a complete examination on July 6, 1949. It was his conclusion that the patient had sustained a sprain of the lumbosacral or lumbar muscles and ligaments, which had *223 healed well, and that in addition there was evidence of hypertrophic arthritis involving the bodies of the lumbar vertebrae, which latter condition he felt had existed for some years and had not been altered or changed appreciably by the accident. His emphatic opinion was that Young’s complaints of pain were not justified, and that he was fully able to return to his former occupation.
We are in full accord with the conclusion of the trial judge that because of the disparity in the opinions of the medical experts it would be difficult to decide the case on the basis of the medical testimony alone.
At the original trial the plaintiff produced five lay witnesses who related circumstances connected with his daily routine since the accident. These witnesses characterized him as being akin to a semi-invalid.
David Johnson, who is married to Young’s cousin and who lives in plaintiff’s household, testified that he had seen Young almost every day for the past four years, and that since the accident it has been necessary to help Young out of bed in the mornings,, because of his complaint that the pain in his back prevented him from arising by his own efforts.
According to Leon Green, a close friend of plaintiff, it was necessary, up to November of 1949, on many occasions to put his arms around Young and help him out of bed. He states that Young could not even get out of a chair without help until December, 1949.
Young’s brother-in-law, Otha Gibbs, who claims that he saw plaintiff nearly every morning, stated that plaintiff “Can’t get up or down,” and that he had to assist him to the bathroom and back. His testimony is that it takes two people to help Young get out of bed each morning, and that when he saw Young on the Sunday before the trial his assistance was required, and that within the prior two weeks Green and Gibbs had assisted him in raising Young. He maintained that at the time of the trial Young could not arise from a chair, notwithstanding that during the course of the trial Young demonstrated his ability to arise from the witness chair without assistance by holding on to the arms of the chair.
Young’s wife testified that he had done no work since the accident, except that on one day he helped to load dirt into a truck. She states that she helps to dress and undress Young, and assists in pulling him from the bed.
Young’s brother saw him nearly every day during the past year, and says he dressed and undressed him upon the occasions when Young left home to visit the doctors.
When plaintiff took the stand on the original trial, he testified:
“Q. What employment have you had since the accident? A. Haven’t had any.
“Q. You have done no work at all? A. No, sir, wasn’t able to.
“Q. You have not earned a penny since the accident? A. No, sir.
******
“Q. Have you been able to do any work since your back was hurt? A. No, sir.
“Q. Have you tried? A. I tried to help a man load two loads of dirt and in the meantime it was three days I was laid up.
“Q. You were not able to finish the day’s work? A. No. sir, I wasn’t able to.”
However, when the matter was retried on May 8, 1950, the defendant produced several witnesses, whose testimony in our opinion destroys plaintiff’s good faith and leads us to the belief that he is a malingerer and is endeavoring to recover compensation by resorting to perjured testimony to make out a case. On May 8, 1950, defendant’s counsel expressed a desire to place the plaintiff on the stand for cross-examination, whereupon his attorney stated that Young had been cross-examined on the original trial, and “that was the end of his testimony.”
It was proved by defendant beyond a shadow of doubt that plaintiff, notwithstanding the postulations of himself and *224 his lay witnesses that he was sedentary as a result of his injuries, had actually engaged in a gainful occupation, that of a filling station attendant, from December 28, 1950, up to the date of the trial, with the exception of a period of about two weeks. The filling station in question is located at Canal and St. Patrick Streets, and Young received a wage of $28 a week, his working hours being from 6:30 in the morning to 4:00 in the afternoon, and his duties were to wash cars, change tires, scrub the driveways, and ride a motorcycle. No attempt was made to refute the statements of the operators of the filling station.
Plaintiff’s counsel argues that even if Young did work in the filling station for several months, the duties of his employment there were dissimilar to and not so arduous as the nature of the work he performed at the time of the accident, and that the additional testimony produced on the new trial does not militate against plaintiff’s right to recover compensation for permanent and total disability.
It is true that the jurisprudence is well settled to the effect that the phrase "work of any reasonable character” as used in the Workmen’s Compensation Statute means work of a similar nature and kind as was performed by the injured workman at the time of the accident. But we are not concerned with that in this case. The testimony was introduced for the purpose of impeaching the testimony of plaintiff, his friend, and four relatives, who insisted that he was incapacitated to such an extent that he was practically helpless.
It is patent that the attempt to deceive the court, both by plaintiff and by his witnesses, was deliberate and studied. Plaintiff’s job at the filling station required that he report for work at 6:30 in the morning, and the witnesses undoubtedly knew that he was working and that the claim that they lifted him out of bed each morning was purely mythical. Young’s wife denied vehemently that he had done any work, except for the few hours when he shoveled dirt into a truck. Young had absolutely no scruples against producing perjured witnesses. This is manifest from the testimony of Chester Green, who appeared and testified that he was working with Young on May 4, 1949, and that he witnessed the accident. The timekeeper and an employee of the accounting department of the United Fruit Company testified positively that on May 4, 1949, the date of the accident, Green was not working, and that the records of the company disclosed that he had not worked for the defendant at any time between April 21 and May 12, 1949. The accident was conceded by the defendant, yet Young saw fit to produce his friend, Chester Green, who was not present, to testify that he witnessed the occurrence on the wharf.
Not alone did Young endeavor to deceive the court, but a reading of the testimony of his three medical experts leads us to the conclusion that he misled them as to his physical condition. We entertain not the slightest doubt that the experts who appeared for Young were*in good faith, and that their findings, as testified to on the witness stand, were honest and predicated largely upon the subjective complaints made by the plaintiff himself. The defendant’s experts were both of the opinion from the beginning that plaintiff’s complaints were simulated.
We fully concur in the remarks of the trial judge, as contained in his reasons for judgment, that “the plaintiff and his witnesses deliberately attempted to mislead the Court and that the plaintiff deliberately lied for this purpose.”
For the above reasons, the judgment appealed from is affirmed.
Affirmed.